# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 96-CA-00038-SCT

*REBECCA HENRY, ADMINISTRATRIX OF THE*
*ESTATE OF AARON E. HENRY, DECEASED*

*v.*

*LEONARD HENDERSON*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/15/95 |
| TRIAL JUDGE: | HON. FRANK G. VOLLOR |
| COURT FROM WHICH APPEALED: | COAHOMA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | ELLIS TURNAGE |
| ATTORNEY FOR APPELLEE: | CHARLES E. WEBSTER |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 7/24/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 8/14/97 |

**BEFORE PRATHER, P.J., PITTMAN AND McRAE, JJ.**

**PITTMAN, JUSTICE, FOR THE COURT:**

¶1. Aaron Henry appeals the denial of his complaint contesting an election contest in which he was a candidate. The lower court determined that it did not have jurisdiction pursuant to our ruling in *Foster v. Harden*, 536 So. 2d 905 (Miss. 1988). Henry contends that the lower court erred by not finding that *Foster* was subject to the Voting Rights Act of 1965 (Act) as amended and, therefore, must be submitted to the United States Attorney General for Section 5 pre-clearance before it may be legally enforced. Henry asserts that in the alternative *Foster* is limited to legislative election contests involving issues relating to the qualifications and the competence of legislators and not to the issue of which candidate received the most votes.

¶2. Henry and Leonard Henderson were candidates in the August 1995 Democratic primary election for state representative, district 26 located in parts of Bolivar and Coahoma counties. Henderson received a total of 2100 votes. Henry received 2036 votes. Henry petitioned the Mississippi Democratic Party State Executive Committee (State Executive Committee) to investigate the

election. The State Executive Committee directed the Coahoma County Democratic Executive Committee (CCDEC) to convene and investigate the election contest petition. The CCDEC held a hearing on the petition and found Henderson to be the proper winner. The State Executive Committee adopted the findings of the CCDEC and affirmed the certification of Henderson. Pursuant to Miss. Code Ann. § 23-15-927 (1972), Henry filed a complaint to contest the election in the Circuit Court of Coahoma County. Circuit Court Judge Frank Vollor was appointed to preside over this election contest. Henderson filed a Motion to Dismiss with the lower court based on *Foster*, which held that Section 38 of Article 4 of the Mississippi Constitution deprived the circuit court of jurisdiction to hear an election contest relating to the "qualifications" of a candidate for the state senate. *Foster v. Harden*, 536 So. 2d 905, 907 (Miss. 1988). Henry subsequently amended his complaint to include a claim under Section 5 of the Voting Rights Act, i.e., that the *Foster* case had not been pre-cleared through the United States Justice Department and, therefore, was not law. Notwithstanding this amendment, Judge Vollor found the *Foster* case persuasive and held that his court lacked subject matter jurisdiction.

¶3. In *Foster* a candidate for the Mississippi Senate challenged her opponents's residency qualifications. The lower court dismissed for lack of subject matter jurisdiction. This Court affirmed the lower court on the basis of Article 4, Section 38 of the Constitution. This section states each legislative body shall judge the qualifications, return and election of its own members. The Court ruled that § 38 vests competence of the member's qualifications for office in the Senate. The Court noted that a question of law -- whether the candidate met qualifications for the residency requirement required in § 42 -- was presented, but because this particular decision was constitutionally placed elsewhere, the Court had no authority to hear this case. *Foster*, 536 So. 2d at 907. The lower court found *Foster* persuasive and held that it did not have subject matter jurisdiction to hear Henry's case.

¶4. Henry argues that the *Foster* decision is a change of a standard, practice or procedure with respect to voting different from the standard, practice and procedure in force and effect on November 1, 1964. He asserts that this is a violation of § 5 of the Act, because § 5 requires Mississippi and all of its political subdivisions to obtain either administrative or judicial preclearance that the change does not have the effect of denying or abridging the right to vote on account of race or color before implementing any voting change. 42 U.S.C. A. § 1973(c) (1994). Further, the Supreme Court has held that a voting change will not be effective as law until and unless cleared pursuant to one of these two methods. *Clark v. Roemer*, 500 U.S. 646, 652, 111 S.Ct. 2096, 2101, 114 L.Ed.2d 691 (1991) (citing *Connor v. Waller*, 421 U.S. 656 (1975) (per curiam)). The Supreme Court has stated that § 5 is to be interpreted broadly. *Allen v. State Board of Elections*, 393 U.S. 544, 568 (1969). Henry argues that the statutory proceeding used to contest elections is essentially a method of determining the outcome of an election. And the determination of which candidate won an election is a standard, practice or procedure with respect to voting within the meaning of the Act. Thus, Henry asserts that the change in *Foster* falls within the protection of § 5.

¶5. In support of his position, Henry cites to the federal regulation that identifies changes which concern the counting of votes, as well as any change in the method of determining the outcome of an election, as types of changes affecting voting. 28 C.F.R. § 51.13(b), (f) (1996).

¶6. The Supreme Court most recently considered § 5 of the Act in *Presley v. Etowah County Commission*, 502 U.S. 491, 117 L.Ed.2d 51, 112 S.Ct. 820 (1992). In *Presley* the Supreme Court

addressed *Allen* and its significance; however, it began to reign in the broad scope of the Act. The Supreme Court stated that it agreed with *Allen'*s holding that the scope of § 5 is expansive within its area of operation; yet, the Court held that Congress did not intend for the Act to subject "all or even most decisions of the government in covered jurisdictions to federal supervision." *Id.* at 64. Any changes covered by the Act must bear a direct relation to voting itself. *Id.* at 68. The Supreme Court stated it was necessary to begin distinguishing between those governmental decisions that involve voting and those that do not. *Id.* at 64-65. Four instances where § 5 would apply were set out by the Supreme Court:

> 1. cases involving changes in the manner of voting;
>
> 2. cases involving changes in candidacy requirements and qualifications;
>
> 3. cases involving changes in composition of the electorate; and
>
> 4. cases affecting the creation or abolition of an elective office.

*Id.* at 63. The Supreme Court noted that these instances were not exhaustive but held, "[c]hanges which affect only the distribution of power among officials are not subject to § 5 because such changes have no direct relation to, or impact on, voting." *Id.* at 65-66. The changes in *Presley* affected only the allocation of power among governmental officials.[1] Because the changes had no impact on the substantive question of whether a particular office would be elective or the procedural question of how an election would be conducted, then the changes did not involve "a new voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting." 42 U.S.C.A. § 1973(c) (1994).

¶7. Subsection (f) of the federal regulation identifying as a voting change any change in the method of determining the outcome of an election appears to be similar to the situation in *Foster*. However, it does not comport with the reasoning of *Presley*. That is, that Foster does not bear a direct relation to the act of voting.

¶8. The issue of whether *Foster* is subject to § 5 is best analyzed in terms of the criteria set out in *Presley*, asking the following questions:

> 1. Does *Foster* affect the manner of holding elections?
>
> 2. Does *Foster* impose additional candidacy qualifications or requirements?
>
> 3. Does *Foster* disturb the composition of the electorate?
>
> 4. Does *Foster* increase or diminish the number of officials for whom the electorate may vote?

¶9. The answer to all of these questions is "no." Of course, *Foster* in some sense implicates voting; however, it does not bear a direct relation to voting. The "change" in *Foster* had an impact only on the election contest procedure; it did not alter the actual residency requirements. It merely altered the state governmental body to which the contest should be directed. In effect it redistributed the decision-making process from the circuit court to the respective legislative body. Election contests are after the fact and have no direct bearing on the act of voting. Therefore, *Foster* would not be

subject to § 5. The reasoning of the *Foster* case -- that this is a question of law, but is constitutionally placed elsewhere -- applies in Henry's situation. Thus, the lower court correctly held it had no jurisdiction.

¶10. Alternatively, Henry argues that § 38 applies only to the qualifications and competence of legislators and not to contests of an election. As stated above, § 38 states, "[e]ach house shall elect its own officers, and shall judge of the qualifications, return and election of its own members." Miss. Const. Art. IV, § 38. Henry cites two Supreme Court cases dealing with Art. I, § 5 of the United States Constitution. Section 5 contains two parts. The first part states that each house shall be the judge of the elections, returns, and qualifications of its own members . . . . The second part states that each house may determine the rules of its proceedings, discipline its members, etc. U.S. Const. Art. I, § 5. In ***Roudebush v. Hartke***, cited by Henry, the incumbent Hartke won his Senate seat in Indiana by 4,833 votes. 405 U.S. 15, 31 L.Ed.2d 1, 13, 92 S.Ct. 804 (1971). This result was certified by the Secretary of State to the Governor. Roudebush filed for a recount in eleven counties. Hartke moved for a dismissal on the ground that Indiana's recount procedure was in conflict with the Indiana and Federal Constitution. The state court granted Roudebush's petition for a recount. A three-judge federal panel held for Hartke. *Id.* at 7. The Supreme Court reversed and held that "Art. 1, § 5 does not prohibit Indiana from conducting a recount of the 1970 election ballots for United States Senator." *Id.* at 12. The Supreme Court reasoned that Art. 1, § 5 does not prohibit Indiana from conducting a recount *because* Art. 1, § 4 empowers the states to oversee the conduct of senatorial elections. ***Roudebush***, 31 L.Ed.2d at 12. The Court in a footnote cited to a prior decision, ***Powell v. McCormack***, where they had held that the meaning of Art. 1, § 5 of the federal constitution would be construed to mean that Congress is limited to the standing qualifications prescribed in the Constitution when judging its members. *Id.* ***See also Powell v. McCormack***, 395 U.S. 486, 23 L.Ed.2d 491, 511, 89 S.Ct. 1944 (1969).

¶11. Neither of these cases holds that Art. I, § 5 of the United States Constitution applies only to the qualifications and competence of legislators. In fact ***Powell*** was actually dealing with part 2 of § 5 concerning discipline of the House's members.[2]

¶12. The Constitution gives authority to each house to judge the return and election of its own members. Return and election includes the proper number of votes cast for each candidate. Therefore, as in *Foster*, the lower court would be without jurisdiction.

¶13. **AFFIRMED.**

**PRATHER AND SULLIVAN, P.JJ., McRAE, ROBERTS, SMITH AND MILLS, JJ., CONCUR. LEE, C.J., CONCURS IN RESULT ONLY. BANKS, J., NOT PARTICIPATING.**

1. The changes instituted in *Presley* were a redistribution of power among county commissioners, and the commissioners' s adoption of a Unit System, and its concomitant transfer of operations to the county engineer. *Id.* at 56.

2. Powell, a member of the House of Representatives, deceived House authorities as to travel

expenses during the 89th Congress. After his re-election, the 90th Congress refused to seat him. He filed suit, thus the issue of Art. I, § 5.